No. 22-2142

# In the United States Court of Appeals for the Fourth Circuit

DAVID DUVALL,

*Plaintiff-Appellee,*

v.

NOVANT HEALTH, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of North Carolina

## BRIEF OF APPELLANT NOVANT HEALTH, INC.

Charles E. Johnson
Angelique R. Vincent-Hamacher
Stephen M. Cox
Travis S. Hinman
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
704.377.2536

Benjamin R. Holland
Margaret Santen Hanrahan
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
201 South College Street
Charlotte, North Carolina 28244
704.342.2588

*Counsel for Novant Health, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

DISCLOSURE STATEMENT ............................................................ 1

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENTED ...................................................................... 4

INTRODUCTION .............................................................................. 4

STATEMENT OF FACTS ................................................................. 6

    A.    Duvall's employment and termination ......................... 6

    B.    Duvall's post-termination failure to look for work ..... 11

    C.    Novant Health creates a diversity, inclusion and health equity plan ......................................................... 15

        1.    Novant Health adopts an "engagement" incentive under the D&I plan during Duvall's employment ......................................... 15

        2.    Novant Health declines to adopt "diversity" incentives or other metrics under the D&I plan during Duvall's employment .................... 17

    D.    Duvall's lawsuit and jury trial ................................... 19

    E.    Post-verdict proceedings ........................................... 22

SUMMARY OF ARGUMENT ......................................................... 24

STANDARD OF REVIEW............................................................... 28

ARGUMENT .................................................................................... 29

I.   The district court erred by concluding that a jury could properly have found that Novant Health's termination of Duvall constituted intentional discrimination ............... 29

     A.   Novant Health's D&I plan does not support a finding that Cureton's termination decision constituted intentional discrimination ...................... 33

          1.   Novant Health's D&I plan is not evidence of intentional discrimination ................................ 33

          2.   Duvall offered no evidence that Novant Health's D&I plan affected Cureton's decision to terminate Duvall's employment ...... 38

     B.   No admissible evidence reveals a "pattern" of discrimination against white men that supports a finding of intentional discrimination against Duvall ...................................................... 45

          1.   The jury was not allowed to rely on evidence of terminations of employees who did not report to Cureton ............................... 45

          2.   The evidence that Duvall offered concerning Cureton's alleged terminations of other white male executives does not support a finding of intentional discrimination ................ 46

     C.   Duvall's subjective belief that his termination was based on his race or sex is not sufficient to support a finding of intentional discrimination ........ 48

II.  The district court erred by concluding that Duvall mitigated his damages and by awarding him back pay and front pay ....................................................... 50

     A.   A plaintiff in a Title VII case must mitigate his damages to be eligible for a back pay or front pay award ........................................................... 50

B.   Duvall failed to meet the standards of diligence and industriousness required of a Title VII plaintiff, and he is, therefore, barred from recovering back pay or front pay ................................ 53

C.   The district court erred by concluding that Duvall satisfied his obligation to mitigate damages ............. 57

III.  The district court erred by concluding that Duvall presented evidence sufficient to support a punitive damages award .................................................... 60

A.   Duvall did not prove that Cureton discriminated in the face of a perceived risk that his decision would violate Title VII ................................. 62

B.   Novant Health's good-faith efforts to comply with Title VII preclude a punitive damages award ............ 65

CONCLUSION ........................................................ 67

REQUEST FOR ORAL ARGUMENT .................................... 69

CERTIFICATE OF COMPLIANCE ...................................... 71

iii

# TABLE OF AUTHORITIES

## Cases

*Balderson v. Lincare Inc.*,
  62 F.4th 156 (4th Cir. 2023) .................................................... 28, 32, 50

*Bandy v. City of Salem*,
  59 F.4th 705 (4th Cir. 2023) ......................................................... 30, 33

*Bennett v. CSX Transp., Inc.*,
  552 F. App'x 222 (4th Cir. 2014).................................................. 48, 49

*Benson v. Thompson Cadillac-Oldsmobile, Inc.*,
  287 F. App'x 249 (4th Cir. 2008)......................................................... 29

*Bernstein v. St. Paul Cos., Inc.*,
  134 F. Supp. 2d 730 (D. Md. 2001) .............................................. 34, 42

*Bostron v. Apfel*,
  104 F. Supp. 2d 548 (D. Md. 2000) ...................................................... 34

*Brady v. Thurston Motor Lines, Inc.*,
  753 F.2d 1269 (4th Cir. 1985).......................................................... 51, 52

*Brown-Thomas v. Hynie*,
  367 F. Supp. 3d 452 (D.S.C. 2019)....................................................... 67

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.*,
  333 F.3d 536 (4th Cir. 2003).......................................................... 28, 66

*Carter v. Ball*,
  33 F.3d 450 (4th Cir. 1994)................................................................... 46

*Christensen v. Equitable Life Assur. Soc'y of the United
  States*, 767 F.2d 340 (7th Cir. 1985)..................................................... 64

*Coppinger v. Wal-Mart Stores, Inc.*,
  2009 WL 3163211 (N.D. Fla. Sept. 30, 2009) ..................................... 35

*Danial v. Morgan State Univ.*,
426 F. Supp. 3d 135 (D. Md. 2019) ........................................ 32

*DeJarnette v. Corning Inc.*,
133 F.3d 293 (4th Cir. 1998) .................................................. 29

*Dennis v. Columbia Colleton Med. Ctr.*,
290 F.3d 639 (4th Cir. 2002) ............................................ 28, 29

*EEOC v. Consol Energy, Inc.*,
860 F.3d 131 (4th Cir. 2017) .................................... 60, 61, 64

*EEOC v. Fed. Express Corp.*,
513 F.3d 360 (4th Cir. 2008) ...................................... 61, 62

*EEOC v. Loflin Fabrication, LLC*,
462 F. Supp. 3d 586 (M.D.N.C. 2020) .................................. 63

*EEOC v. Service News Co.*,
898 F.2d 958 (4th Cir. 1990) ...................................... 51, 52

*Ellis v. Ringgold Sch. Dist.*,
832 F.2d 27 (3d Cir. 1987) .................................................. 54

*Ford Motor Co. v. EEOC*,
458 U.S. 219 (1982) ............................................................ 51

*Fry v. Rand Constr. Corp.*,
964 F.3d 239 (4th Cir. 2020) .............................................. 48

*Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*,
160 F.3d 177  (4th Cir. 1998) .............................................. 48

*Gries v. Zimmer, Inc.*,
795 F. Supp. 1379 (W.D.N.C. 1992) .................................... 50

*Harris v. L&L Wings, Inc.*,
132 F.3d 978 (4th Cir. 1997) .............................................. 60

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
354 F.3d 277 (4th Cir. 2004) .............................................. 30

*Kolstad v. Am. Dental Ass'n,*
   527 U.S. 526 (1999) .................................................................. 61, 66

*Lampley v. Big Discount Food Store, Inc.,*
   687 F. Supp. 211 (M.D.N.C. 1988) ...................................................... 54

*Lightner v. City of Wilmington,*
   545 F.3d 260 (4th Cir. 2008) ............................................................ 31

*Lovelace v. Sherwin-Williams Co.,*
   681 F.2d 230 (4th Cir. 1982) ............................................................ 49

*Lowery v. Circuit City Stores, Inc.,*
   206 F.3d 431 (4th Cir. 2000) ......................................................... 29, 66

*Lutes v. Goldin,*
   62 F. Supp. 2d 118 (D.D.C. 1999) ...................................................... 35

*Mangold v. PECO Energy,*
   2021 WL 6072818 (E.D. Pa. Dec. 23, 2021) .................................... 34, 40

*Mattenson v. Baxter Healthcare Corp.,*
   438 F.3d 763 (7th Cir. 2006) ............................................................ 50

*McCormick v. Gasper,*
   2022 WL 16586621 (6th Cir. Nov. 1, 2022) .............................. passim

*Mlynczak v. Bodman,*
   442 F.3d 1050 (7th Cir. 2006) .......................................................... 35

*O'Toole v. Northrop Grumman Corp.,*
   499 F.3d 1218 (10th Cir. 2007) ........................................................ 67

*Quintero v. Publix Super Markets, Inc.,*
   2006 WL 8431655 (N.D. Ga. Jan. 18, 2006) ...................................... 32

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133 (2000) ................................................................... 29, 30

*Rodgers v. Eagle All.,*
   586 F. Supp. 3d 398 (D. Md. 2022) ................................................... 67

*Stephens v. S. Atl. Canners, Inc. (Coca Cola Co.)*,
   848 F.2d 484 (4th Cir. 1988)..................................................60

*Szedlock v. Tenet*,
   139 F.Supp. 2d 725 (E.D. Va. 2001) ...................................52

*Texas Dep't of Cmty. Affairs v. Burdine*,
   450 U.S. 248 (1981)............................................................28

*Tomaszewski v. City of Philadelphia*,
   460 F. Supp. 3d 577 (E.D. Pa. 2020)...................................35

*Wagner v. Dillard Dept. Stores, Inc.*,
   17 F. App'x 141 (4th Cir. 2001) ..........................................56

*Ward v. AutoZoners, LLC*,
   958 F.3d 254 (4th Cir. 2020)...........................................61, 64

*Weinerth v. Martinsville City Sch. Bd.*,
   2019 WL 2181931 (W.D. Va. May 20, 2019)..................34, 37

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000)............................................................45

## Statutes

28 U.S.C. § 1291 .......................................................................2

28 U.S.C. § 1331 .......................................................................1

29 U.S.C. § 1332 .......................................................................1

29 U.S.C. § 1367 .......................................................................1

42 U.S.C. § 2000e-5(g) ............................................................50

42 U.S.C. §§ 2000e *et seq.*......................................................1

## Rules

Fed. R. App. P. 4(a)(4)(A)(iv) ...............................................2, 3

## DISCLOSURE STATEMENT

Appellant Novant Health, Inc. ("Novant Health"), a North Carolina non-profit corporation, is not a publicly held corporation or entity or a trade association. Novant Health has no parent corporations, and no publicly held corporation or entity holds 10% or more of the stock of Novant Health. No publicly held corporation or entity has a direct financial interest in the outcome of this litigation.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 because the claims of Plaintiff-Appellee David Duvall ("Duvall") arose under federal law, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The district court had supplemental jurisdiction over Duvall's state-law claims under 29 U.S.C. § 1332 because Duvall was a Michigan resident when he filed his lawsuit against Novant Health, a North Carolina non-profit corporation. The district court also had supplemental jurisdiction under 29 U.S.C. § 1367 because Duvall's federal- and state-law claims arose from a common nucleus of operative fact.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the jury reached a verdict in favor of Duvall on his discrimination claims on October 26, 2021 and, after ruling on various post-trial motions, the district court entered final judgment for Duvall on October 28, 2022.

This appeal is timely under Fed. R. App. P. 4(a)(4)(A)(iv). The jury issued its verdict awarding Duvall punitive damages on October 26, 2021. Thereafter, on February 1, 2022, Novant Health timely filed a renewed motion for judgment as a matter of law and a motion to set aside the jury's punitive damages award under Fed. R. Civ. P. 50(b). On the same date, Duvall filed motions seeking equitable relief, including front pay and back pay.

On August 11, 2022, the district court entered an order that (i) denied Novant Health's renewed motion for judgment as a matter of law; (ii) granted in part and denied in part Novant Health's motion to set aside punitive damages; and (iii) granted in part Duvall's motion for equitable relief. The court entered judgment consistent with that order on August 12, 2022.

Duvall timely filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e).  On October 19, 2022, the district court entered an order granting in part and denying in part Duvall's Rule 59(e) motion. The district court entered an amended judgment on October 28, 2022. Novant Health timely filed a notice of appeal on November 4, 2022.  *See* Fed. R. App. P. 4(a)(4)(A)(iv).

## ISSUES PRESENTED

1.  Did the district court err by upholding the jury's verdict of race and sex discrimination in favor of Duvall and against Novant Health?

2.  Did the district court err in awarding back pay and front pay to Duvall despite his failure to mitigate his damages?

3.  Did the district court err by awarding punitive damages to Duvall in connection with his Title VII discrimination claim?

## INTRODUCTION

Duvall, Novant Health's former executive in charge of marketing and communications and an at-will employee, was hired by Novant Health in 2013 and fired five years later. The man who hired and fired him, former Executive Vice President Jesse Cureton ("Cureton"), acknowledged that Duvall had considerable talents and abilities in some areas. But as Cureton explained at trial, Duvall lacked the engagement and credibility required of a senior executive at the company. After Cureton terminated Duvall's employment, Duvall

4

admitted that Cureton had not discriminated against him and had no discriminatory animus.

Although he conceded the absence of discriminatory motive by Cureton, Duvall nevertheless contended at trial that, as a white male, he was a victim of Novant Health's diversity and inclusion ("D&I") plan. This theory is puzzling, because Duvall had earlier praised Novant Health's D&I efforts and avidly promoted them. Duvall's argument is especially baffling, however, because he could not point to any feature of Novant Health's D&I plan that would have called for his termination. In particular, the plan did not contain any binding employment targets or compensation incentives that would have induced Cureton to fire Duvall. At bottom, Duvall's argument that his employment was terminated because of Novant Health's D&I plan is based on nothing more than speculation.

Not only is Duvall's argument for liability fatally flawed, his case for damages is defective, too. The well-established law of this circuit requires a Title VII plaintiff who seeks back pay and front pay to mitigate his damages. Duvall failed to shoulder that burden, refusing to apply for any jobs following his termination from Novant Health and

instead waiting at home for corporate recruiters and LinkedIn contacts to reach out to him.  At his "level," Duvall claims, applying for jobs is "typically not done."  Such blithe disregard for his obligation to look for work disqualifies Duvall from receiving back pay and front pay.

Finally, Duvall is not entitled to punitive damages in this case because, by his own admission, Cureton lacked the recklessness or malice needed to support such an award.  Indeed, as noted above and as Duvall has admitted, Cureton lacked any discriminatory intent whatsoever.

For all of these reasons, this Court should reverse the district court's judgment upholding the jury's finding of discrimination and awarding Duvall significant monetary relief.

## STATEMENT OF FACTS

### A.    Duvall's employment and termination

Novant Health's former Executive Vice President and Chief Consumer Officer, Jesse Cureton (a Black male), hired David Duvall (a white male) as Senior Vice President of Marketing and Communications for Novant Health in 2013.  JA29 ¶¶ 9-10.  Duvall began his employment with Novant Health on August 5, 2013.  JA29 ¶ 9.  Duvall

reported to Cureton and held the same position throughout his employment.  JA29 ¶¶ 9-10.  At all times, Duvall was an at-will employee.  JA1304.

Throughout his employment, Duvall was responsible for Novant Health's internal communications, public relations, and marketing. *See* JA1703, JA882 (Tr. Vol. IV, 200:16-18).  In some respects, Duvall's performance met or exceeded Novant Health's expectations during his tenure.  He helped develop a method of insights and analytics to assess Novant Health's marketing efforts, spoke at national conferences, and headed a marketing team that won national awards.  JA370-72 (Tr. Vol. I, 150:23-152:20), JA1466-1522, JA1525, JA1531, JA1543-44. Consistent with these accomplishments, Duvall's written performance reviews were generally positive.  JA1526-29, JA1577-80.

In some, critical respects, however, Duvall's performance fell short.  For example, in 2016, Duvall was scheduled to present to Novant Health's executives, senior leaders, and corporate board members at a meeting of all Novant Health community boards of directors.  JA491-92 (Tr. Vol. III, 36:14-37:4), JA243-44 (Tr. Vol. II, 23:1-24:3).  Shortly after beginning his presentation, Duvall became unable to present and

walked off the stage.  JA491-92 (Tr. Vol. III, 36:14-37:9), JA243 (Tr. Vol.

II, 23:5-7), JA396 (Tr. Vol. II, 176:17-23).  Cureton stepped in to

continue the presentation on Duvall's behalf.  JA243 (Tr. Vol. II, 23:5-

10), JA492 (Tr. Vol III, 37:4-17).

In the wake of this incident and the executive team's negative

reaction to it, Cureton counseled Duvall that he could move forward

from the event by rebuilding trust and credibility with Novant Health's

Board of Directors (the "Board").  JA830-31 (Tr. Vol. IV, 148:22-149:18),

JA383 (Tr. Vol. II, 163:9-25), JA414 (Tr. Vol. II, 194:9-12).  Despite this

guidance, Duvall repeatedly declined internal speaking opportunities,

including before the Board, instead delegating appearances at

significant internal events to his subordinates.  JA408 (Tr. Vol. II,

188:6-16), JA836-38 (Tr. Vol. IV, 154:18-156:16), JA832 (Tr. Vol. IV,

150:17-24), JA859 (Tr. Vol. IV, 177:6-177:12), JA864 (Tr. Vol. IV, 182:2-

9).  Duvall's passive approach disappointed Cureton, who explained

that no opportunity is more important for a Novant Health leader than

to speak before the Board and executive team.  JA832 (Tr. Vol. IV,

150:6-16).  Cureton emphasized the need for Duvall to engage his peers

(other senior executives) and superiors (executive team members and directors) across Novant Health. JA835-36 (Tr. Vol. IV, 153:20-154:17).

Despite Cureton's feedback, Duvall's lack of engagement continued. Beginning in 2018, Novant Health increased its focus on improving patient experience. JA836-37 (Tr. Vol. IV, 154:21-155:12). The emphasis on patient experience mandated an "all hands on deck" approach. JA836-37 (Tr. Vol. IV, 154:21-155:12). Cureton emphasized to Duvall the importance of engaging and collaborating with Novant Health leaders on patient experience and told Duvall he "need[ed him] at the table" for the initiative. JA836-37 (Tr. Vol. IV, 154:21-155:22).

Notwithstanding this direct request, Duvall instructed Kati Everett, his subordinate, to attend a patient experience meeting with members of the executive team in his place. JA837-39 (Tr. Vol. IV, 155:23-157:5). In Cureton's view, this was another example of Duvall losing traction with the executive team and failing to engage on critical issues. JA838-39 (Tr. Vol. IV, 156:13-157:16). Cureton had also come to believe that it was best for Novant Health to incorporate a new perspective into its marketing and communications approach by

focusing on consumer-oriented experience.  JA397-98 (Tr. Vol. II, 177:21-178:7).

Based on these determinations, Cureton decided to, and did, terminate Duvall's at-will employment effective July 30, 2018.  JA838-39 (Tr. Vol. IV, 156:9-157:5), JA393 (Tr. Vol. II, 173:14-16), JA28 ¶ 2. Novant Health promoted two of Duvall's deputies, Kati Everett (a white female) and Tammy Jones (a Black female), to Senior Vice President of Communications and Senior Vice President of Marketing, respectively. JA1429.  Ten months later, Novant Health hired Vicky Free (a Black female) as its Senior Vice President and Chief Marketing Officer. JA759 (Tr. Vol. IV, 77:7-10).  Ms. Free brought to Novant Health consumer-based marketing experience at internationally known organizations like Disney, BET, and Turner Networks.  JA398-99 (Tr. Vol. II, 178:8-179:10).

In a conversation that Cureton had with Shane Grady (a corporate recruiter who was considering Duvall for another position) following Duvall's termination, Cureton was complimentary of Duvall and spoke generously of his talents and abilities.  JA303-04 (Tr. Vol. II, 83:24-84:13), JA307-09 (Tr. Vol. II, 87:7-89:25), JA312-13 (Tr. Vol. II, 92:22-

93:13).  He emphasized, however, that Duvall lacked sufficient "command" for a senior executive—a high bar for Novant Health's CEO Carl Armato.  JA311 (Tr. Vol. II, 91:5-18), JA312 (Tr. Vol. II, 92:6-14).

### B.    Duvall's post-termination failure to look for work

When asked when he "first start[ed] applying for positions following his termination from Novant," Duvall conceded that he "technically didn't apply" for jobs.  JA1936 (Pl. Dep. Tr. 215:3-5.  He went on to explain:

> **A.**    I mean, the way – to be honest with you, the way it works – or frankly, I should say.  All this is honest – is that at this level, we don't typically apply for jobs.  Your availability becomes – recruiters become aware of your availability or if you're not available and they see there may be a good fit, they reach out to you.  And I've had very good luck with that sort of activity.
>
> **Q.**    Okay.  So you mentioned "at this level."  So you're at such a level that you can't even apply for jobs at this point?
>
> **A.**    It's typically not done.
>
> **Q.**    So you haven't actually applied.   Recruiters have brought opportunities –
>
> **A.**    Yes.

JA1976 (Pl. Dep. Tr., 252:9-23).  Duvall employed a similar approach to the use of his LinkedIn network.  He did not initiate contact with other

LinkedIn members concerning employment opportunities; rather, he responded to people who reached out to him. JA1902-03 (Pl. Dep. Tr., 158:22-159:3).

From the time Duvall left Novant Health until June 2019, recruiters brought him employment opportunities at five different employers: Henry Ford Health System in Detroit ("HFHS"), the University of Michigan Medical Center, Johns Hopkins, Minnesota Fairview, and Miami Health in Miami, Florida. *See* JA654-55 (Tr. Vol. III, 199:23-200:16). Other than the position at HFHS, which he ultimately accepted, Duvall pursued only the opportunity at Johns Hopkins. *See* JA655-58 (Tr. Vol. III, 200:17-203:18). He withdrew from consideration for the Minnesota Fairview position because a friend of his speculated that "it was potentially a very kind of difficult situation to step into." JA777-78 (Tr. Vol. IV, 95:7-96:1). He spurned Michigan because he had categorically decided not to consider positions that paid less than $300,000 in base salary. JA779-80 (Tr. Vol. IV, 97:25-98:7). He rejected the Miami position, too, even though it offered in the "low

400 thousands" (his base pay at Novant Health),[1] because he perceived the cost of living in Miami to be high and Miami has a large Spanish-speaking population.  JA780 (Tr. Vol. IV, 98:8-25).

In June 2019, Duvall started working for HFHS as its Senior Vice President PR, Marketing, Communications & Chief Experience Officer. JA662-63 (Tr. Vol. III, 207:23-208:2), JA1679.  His base pay was $575,000, JA1681, compared to the $402,000 that he had been receiving at Novant Health, JA788 (Tr. Vol. IV, 106:15-22).  In addition, HFHS paid him a relocation award of $150,000, a sign-on bonus of $100,000, and a host of deferred compensation, retirement and other benefits. JA1681, JA782 (Tr. Vol. IV, 100:17-23).

HFHS terminated Duvall's employment in January 2020.  JA797 (Tr. Vol. IV, 115:4-9).  Duvall claimed that he was fired because, after he filed this lawsuit against Novant Health, HFHS questioned his commitment to his new position and wondered whether he wanted to return to Novant Health.  JA1957 (Pl. Dep. Tr. 235:7-24).  Duvall

---

[1]    Plaintiff's base salary at Novant Health at the time of his termination was $402,000-$403,000.  JA788 (Tr. Vol. IV, 106:18-20).

13

conceded at trial, however, that HFHS had hired him even after he told them that he had an "unresolved matter" with Novant Health and that a lawsuit could ensue. JA659 (Tr. Vol. III, 204:14-23). He also admitted that HFHS's CEO told him at the time of his termination that "I don't care about the lawsuit." JA1952-53 (Pl. Dep. Tr. 230:23-231:10).

Following his termination from HFHS, executive recruiters contacted Duvall concerning positions at four hospital systems: Brigham and Women's/Massachusetts General, Westchester Medical Center in New York, Ohio State University, and Cape Fear Medical Center in Fayetteville, North Carolina. JA665-66 (Tr. Vol. III, 210:12-211:14), JA1972-73 (Pl. Dep. Tr. 248:22-249:9). He "never even got into active discussions" with Cape Fear because he considered the size of the system and the scope of the job too small—only a "billion dollar system with a team of ten people and two reports." JA1973 (Pl. Dep. Tr. 249:12-22). Duvall never even bothered to find out what the Cape Fear position paid. JA1973 (Pl. Dep. Tr. 249:23-25). He engaged only in "pleasantries" with an Ohio State recruiter during a preliminary phone call. JA1974 (Pl. Dep. Tr. 250:6-23). He had similar introductory calls with recruiters concerning the Mass General and Westchester

opportunities, but he did not follow up on those opportunities. JA666-67 (Tr. Vol. III, 211:6-212:2).

## C. Novant Health creates a diversity, inclusion and health equity plan

In 2016, Novant Health tapped Tanya Blackmon ("Blackmon"), the President and COO of its Huntersville Medical Center, to lead the company's diversity, inclusion, and health equity (hereinafter "D&I") efforts as its Executive Vice President and Chief Diversity & Inclusion Officer. JA1325. In that capacity, Blackmon spearheaded the creation of a D&I strategic plan outlining ways that Novant Health could create an environment of inclusion that valued all employees. JA139 (Tr. Vol. I, 74:5-13), JA186-88 (Tr. Vol. I, 121:23-123:10).

### 1. Novant Health adopts an "engagement" incentive under the D&I plan during Duvall's employment

To demonstrate its commitment to inclusion, and in connection with its D&I plan, Novant Health identified "team member engagement" as one of its 2017-2019 long-term goals. JA1379, JA258-61 (Tr. Vol. II, 38:9-41:13), JA180-84 (Tr. Vol. I, 115:10-119:2). It measured the achievement of this goal exclusively by asking employees whether the "organization values team members from different

backgrounds." JA1379, JA260 (Tr. Vol. II, 40:2-8). A positive response rate to this question of 90 percent or more constituted satisfaction of the goal. JA261 (Tr. Vol. II, 41:3-7).

Some Novant Health executives, including Cureton, participated in an incentive compensation plan based partly on the organization's satisfaction of system-wide goals, including the team member engagement goal. JA179-80 (Tr. Vol. I, 114:23-115:5), JA259-61 (Tr. Vol. II, 39:17-41:13). For such executives at Cureton's level, 10% of their potential incentive bonus was tied to attaining individual goals, while 90 percent was tied to attaining system-wide goals. JA181 (Tr. Vol. I, 116:10-14), JA182-83 (Tr. Vol. I, 117:21-118:14). Other than this bonus based partly on a D&I "team member engagement" inclusion goal, Novant Health did not establish any bonus or other financial incentive based on D&I metrics during Duvall's employment. JA841-42 (Tr. Vol. IV, 159:19-160:5), JA856 (Tr. Vol. IV, 174:9-19), JA251-52 (Tr. Vol. II, 31:25-32:21), JA297-98 (Tr. Vol. II, 77:1-78:12).

2. **Novant Health declines to adopt "diversity" incentives or other metrics under the D&I plan during Duvall's employment**

In addition to its focus on team member engagement, Novant Health's D&I plan expressed a commitment to diversity and spoke of implementing a decision making process that would include "a diversity and inclusion lens" and "embed[]" diversity and inclusion within the organization.  JA1372, JA1376.  The plan also aspired to have a "leadership team that reflect[ed] the community."  JA1351.  In May 2018, Novant Health's Diversity and Inclusion Executive Council (the "Council"), a system-wide council responsible for overseeing and implementing the D&I plan, JA234 (Tr. Vol. II, 14:6-11), reviewed demographic data concerning Novant Health's workforce and asked whether that workforce mirrored the community that the organization served, JA197-200 (Tr. Vol. I, 132:17-135:14), JA1410-14.[2]  At the same meeting, the Council reviewed some potential D&I metrics to adopt and agreed to focus on other metrics at the next meeting.  JA1411-12.

---

[2]      Duvall and Cureton were both members of the Diversity and Inclusion Executive Council, JA1410, JA205-06 (Tr. Vol. I, 140:18-141:6), JA623 (Tr. Vol. III, 168:4-7), which met for the first time in February 2018, JA179 (Tr. Vol. I, 114:17-22).

17

At the next Council meeting, held in October 2018 (after Duvall had been terminated), the Council restated Novant Health's aspiration that "ultimately[,] we want Novant Health's overall workforce to reflect the communities we serve." JA1430. The Council also reviewed demographic data reflecting its leadership team and noted that "[w]e want to reach our targets[;] targets are set by the organization, which is within our strategic imperatives." JA1430-31.

Ultimately, however, Novant Health chose *not* to establish any numerical targets, binding metrics or compensation incentives to achieve workforce diversity during Duvall's employment. JA151 (Tr. Vol. I, 86:6-14), JA856 (Tr. Vol. IV, 174:9-19), JA251-52 (Tr. Vol. II, 31:25-32:21), JA297 (Tr. Vol. II, 77:1-10), JA540-41 (Tr. Vol. III, 85:4-86:14). In fact, in 2019, after Duvall's termination, Novant Health rejected a range of such targets proposed by consulting firm Ernst & Young, reasoning that the proposed targets were inconsistent with the organization's focus on employee and patient inclusion. JA1432-50, JA191 (Tr. Vol. I, 126:5-23), JA252-54 (Tr. Vol. II, 32:22-34:13). Later, following Duvall's termination, Novant Health did adopt a long-term goal to close the gap between the proportion of Asian and

Hispanic/Latino team members within its workforce compared to the communities it served. JA1453, JA256-58 (Tr. Vol. II, 36:5-38:8). The organization never, however, adopted targets, metrics or financial incentives for increasing the number of Black or female employees in the workforce. JA254-55 (Tr. Vol. II, 34:25-35:23).

### D.    Duvall's lawsuit and jury trial

On November 18, 2019, Duvall filed this action against Novant Health in the Western District of North Carolina, asserting claims of race and sex discrimination under Title VII, discrimination in violation of ERISA, and wrongful discharge under North Carolina state law. JA28-35. His claims proceeded to a jury trial beginning on October 18, 2021. JA17.

Both at his deposition and during trial, Duvall admitted that he did not believe that Novant Health had discriminated against him at any time during his employment. JA743-45 (Tr. Vol. IV, 61:7-63:13), JA653 (Tr. Vol. III, 198:10-15). *See also* JA737-38 (Tr. Vol. IV, 55:5-56:3), JA748 (Tr. Vol. IV, 66:18-25), JA755 (Tr. Vol. IV, 73:4-19). He also admitted that he did not believe that Cureton had discriminated against him in the context of his termination. JA653 (Tr. Vol. III,

198:10-18), JA743 (Tr. Vol. IV, 61:22-24), JA744 (Tr. Vol. IV, 62:8-9).

Duvall began to view his termination as discriminatory only months

after it had occurred, when he was unable to come up with any

explanation for the decision that he considered satisfactory.  JA738-39

(Tr. Vol. IV, 56:18-57:1).

Evolving over time, Duvall's theory of race and sex discrimination

ultimately came to rely on (1) Novant Health's D&I plan and (2) an

alleged "pattern" of terminations of white male executives at Novant

Health.  *See* JA76 (Tr. Vol. I, 11:17-24), JA78 (Tr. Vol. I, 13:20-21).  To

demonstrate this alleged "pattern," Duvall sought to offer evidence at

trial about the supposed terminations of several other executives in the

yearlong period bookending his termination.  The district court granted

Novant Health's motion *in limine* and excluded this evidence, JA61, and

later denied Duvall's motion to reconsider the ruling, JA64-65, JA17.

On the first day of trial, however, the district court ruled that

Duvall could present evidence about the terminations of other Novant

Health employees who had reported to Cureton.  JA71-72 (Tr. Vol. I,

6:5-7:16), JA106 (Tr. Vol. I, 41:3-8).  Duvall presented evidence of five

such former employees, whose alleged terminations Duvall cast as proof

that his own termination was based on his race and sex. *See* JA849-53 (Tr. Vol. IV, 167:14-171:6), JA402-05 (Tr. Vol. II, 182:3-185:13).

Throughout trial, the district court stood by its pre-trial ruling that Duvall could not present evidence about the terminations of Novant Health employees who had not reported to Cureton. JA71-72 (Tr. Vol. I, 6:5-7:16), JA106 (Tr. Vol. I, 41:3-8). After Duvall violated this ruling by attempting to testify to such terminations, JA653-54 (Tr. Vol. III, 198:21-199:5), Novant Health objected, JA667 (Tr. Vol. III, 212:6-25), and the district court properly instructed the jury not to consider the testimony, JA705 (Tr. Vol. IV, 23:7-17).

At the close of Duvall's evidence, and again at the end of the trial, Novant Health moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). JA812-18 (Tr. Vol. IV, 130:20-136:6), JA927 (Tr. Vol. V, 16:13-17). The district court denied both motions and submitted the case to the jury. JA827 (Tr. Vol. IV, 145:18-23), JA927 (Tr. Vol. V, 16:18-19), JA1094-95 (Tr. Vol. VI, 110:24-111:3). The jury returned a verdict for Duvall and awarded him $10 million in punitive damages, finding that Duvall's race and/or sex was a motivating factor in Novant Health's termination decision and that Novant Health had not proven

that it would have made the same decision regardless of Duvall's race and/or sex.  JA1138-39.

### E.  Post-verdict proceedings

Following the jury's verdict, and in compliance with extensions granted by the district court to allow for preparation of the trial transcript, Novant Health filed a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), as well as a motion to set aside the punitive damages award.  JA1140-42, JA1143-46.  Duvall opposed these motions.  JA23.  He also filed a motion for entry of judgment on his ERISA claim and for equitable relief in the form of back pay and front pay.  JA1147-48.  In support of his request for back pay and front pay, Duvall submitted evidence about his past and future predicted earnings.  JA1149-63.  Novant Health opposed Duvall's motion for equitable relief.  JA25

On August 11, 2022, the district court entered an order on the parties' post-trial motions.  JA1306-07.  The court denied Novant Health's motion for judgment as a matter of law.  JA1277.  The court declined to set aside the jury's punitive damages award but reduced it

22

to the statutory maximum amount of $300,000.  JA1284-85.  The court rejected Duvall's ERISA claim.  JA1286-91, JA1305.

The district court granted Duvall's motion for equitable relief, concluding that he was entitled to back pay in the amount of $2,341,884 ($3,666,561, less the $1,324,677 Duvall had earned through his post-termination employment with HFHS) plus pre-judgment interest at an 8% rate.  JA1297, JA1305-06.  The district court further concluded that Duvall was entitled to one year of front pay in the amount of $1,078,066.  JA1305-06.  The court rejected Novant Health's arguments regarding Duvall's failure to mitigate.  JA1293-95.

The district court entered judgment against Novant Health in accordance with its order on August 12, 2022.  JA1310.  Eleven days later, Duvall filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e), asking the district court to recalculate his back pay and pre-judgment interest through the date of the judgment and to increase the award to account for its tax impact.  JA1311-13.  Duvall also filed a motion for attorney's fees and costs under Title VII.  JA1317.  Novant Health opposed both motions.  JA26.

On October 19, 2022, the district court entered an order granting Duvall's motion for back pay and pre-judgment interest through the date of the judgment and granting Duvall's motion for attorney's fees. JA1315-20.  The court declined to increase Duvall's damages to account for the tax effects of the judgment.  JA1316.  Consistent with its order, the district court entered an amended judgment on October 28, 2022, awarding Duvall $2,457,527 in back pay; $332,793 in prejudgment interest; $1,078,066 in front pay; $300,000 in punitive damages; $399,105 in attorney's fees; and $15,482.11 in costs.  JA1321.

This appeal followed.

## SUMMARY OF ARGUMENT

The district court erred by upholding the jury's verdict of discrimination and denying Novant Health's renewed motion under Rule 50(b) for judgment as a matter of law.  Well-established Fourth Circuit law requires a plaintiff in a discrimination case to present substantial evidence of *probable*, not merely *possible*, discrimination—a burden that Duvall failed to meet.  *See infra* at 29-53.

As a threshold matter, Duvall's concessions that Cureton—the undisputed sole decision maker in this case—did not discriminate

against him and had no discriminatory animus fatally undermine Duvall's discrimination claims. On that basis alone, those claims should be rejected. *See infra* at 31-33.

The district court brushed aside Duvall's concessions, concluding that the existence of Novant Health's D&I plan and the company's stated desire to have its workforce look like the community it served was evidence from which the jury could reasonably have inferred discrimination. This conclusion is unsustainable. The mere existence of a D&I plan—even one with binding metrics or targets—is not relevant to a discrimination claim unless there is evidence that an employer unlawfully discriminated pursuant to the plan. *See infra* at 33-44.

No such evidence existed here. To the contrary, the evidence at trial indisputably showed that Novant Health's D&I plan did not contain any targets or metrics that would have induced Cureton to fire Duvall. The plan contained only a single goal tied to executive compensation—a "team engagement" goal that sought to determine whether Novant Health's employees felt valued in the workplace. Although the Council reviewed data concerning the demographic

makeup of its workforce and considered a number of metrics to achieve its diversity goals, the Council did not adopt any such metrics during Duvall's tenure. Duvall's suggestion to the contrary is rank speculation, unsupported by the evidence. *See infra* at 38-44.

Likewise, Duvall's argument that Cureton had fired other white men who reported to him in an effort to make Novant Health more diverse is unsubstantiated. In support of this misplaced thesis, Duvall offered at trial evidence of the terminations of five other men who had reported to Cureton. One was Black, not white. Of the remaining four white men, one was not terminated, but transferred to another position within Novant Health. One agreed to leave the company; another was replaced by another white man; and the third left the company because his position was eliminated and unfilled. In short, none of these five examples could even make out a *prima facie* case of discrimination under the law, let alone provide the "substantial evidence" required to prove intentional discrimination. *See infra* at 46-48.

Even if Duvall were able to make out a case of liability against Novant Health, he would not be entitled to damages because he failed to mitigate his alleged loss. Following his termination, Duvall did not

take the initiative to seek or apply for any jobs. Instead, he claimed that, at his "level," applying for jobs is "typically not done." Likewise, Duvall did not even reach out to his extensive LinkedIn network, but waited for his contacts to reach out to him. And when corporate recruiters did approach him with opportunities, Duvall was frequently dismissive of them. *See infra* at 52-56.

Such lax conduct fails even to approach the standard of diligence and persistence required of a plaintiff who seeks back pay and front pay in a discrimination case. Because Duvall failed to mitigate his damages, the district court should have denied him any equitable relief. *See infra* at 50-60.

Finally, the district court's award of punitive damages should be reversed. As Duvall's own concessions make clear, Cureton lacked the recklessness or malice required to support such an award. Even if Cureton had acted with malice, Novant Health's well-established anti-discrimination efforts provide a "good faith" defense that immunizes the company against a punitive damages sanction. *See infra* at 60-67.

For all of these reasons, the district court's judgment upholding the jury's finding of discrimination and awarding Duvall back pay, front

27

pay, punitive damages, and attorney's fees and costs should be reversed.

## STANDARD OF REVIEW

This Court reviews de novo a district court's ruling on a Rule 50(b) renewed motion for judgment as a matter of law. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). "Under Fed. R. Civ. P. 50(b), the question is whether a jury, viewing the evidence in the light most favorable to [the non-movant], 'could have properly reached the conclusion reached by th[e] jury.'" *Id.* (quoting *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 644-45 (4th Cir. 2002)).

In a discrimination case, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Balderson v. Lincare Inc.*, 62 F.4th 156, 165 (4th Cir. 2023). "To defeat an employer's motion for [judgment as a matter of law] as to liability in a discrimination suit, the plaintiff must present substantial evidence to support as a reasonable probability, rather than as a mere possibility, that her employer

discriminated against her because of a protected characteristic."
*DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).

As with the district court's ruling on a renewed motion for judgment as a matter of law, the Court reviews de novo denial of a post-trial motion for judgment as a matter of law on the issue of punitive damages. *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000). The Court reviews a district court's decision to award back pay and front pay for an abuse of discretion. *Benson v. Thompson Cadillac-Oldsmobile, Inc.*, 287 F. App'x 249, 256-57 (4th Cir. 2008) (citing *Dennis*, 290 F.3d at 651).

## ARGUMENT

## I.    The district court erred by concluding that a jury could properly have found that Novant Health's termination of Duvall constituted intentional discrimination.

Duvall bears the burden of proving that Novant Health's termination of his employment constituted intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "[E]mployers are responsible only for acts of the 'actual decisionmaker' behind an adverse employment action, meaning the individual who 'was the one principally responsible for . . . the action.'" *Bandy v. City of*

*Salem*, 59 F.4th 705, 710 (4th Cir. 2023) (quoting *Reeves*, 530 U.S. at 151-52) (internal quotation marks omitted).  Accordingly, Duvall must show that Cureton—the sole decision maker[3]—chose to terminate his employment because of his race or sex.  *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288-89 (4th Cir. 2004), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). The district court erred by concluding that Duvall had carried this burden.

As a threshold matter, Duvall admitted both at his deposition and at trial that he did not believe that he was the victim of intentional discrimination, that Cureton did not discriminate against him, and that Cureton did not have personal animus toward him based on his race or sex:

> **Q.** Let me ask you this:  **Did you, in fact, feel that you had ever been discriminated against while you were working there**?
>
> **A.  I did not.**  In fact, I had a very good relationship with [Cureton], and so I – there was – there's no animus between the two of us.  It was quite the opposite.

---

[3]     Both parties acknowledged at trial that Cureton was the sole Novant Health decision maker responsible for Duvall's termination. JA556-57 (Tr. Vol. III, 101:12-102:11), JA841 (Tr. Vol. IV 159:7-18).

**Q.** And when he fired you, **did you feel that he was firing you out of personal racial animus**?

**A. I did not.** I did not feel it was personal. It was – you know, in the weeks after getting kind of over the shock, one tries to look back and start to put pieces together.

JA653 (Tr. Vol. III, 198:10-15) (emphasis added). *See also* JA737-38 (Tr. Vol. IV, 55:5-56:3), JA743-45 (Tr. Vol. IV, 61:7-63:13), JA748 (Tr. Vol. IV, 66:18-25), JA755 (Tr. Vol. IV, 73:4-19). Consistent with this belief, Duvall never complained about discrimination while employed by Novant Health. He only began to believe that he was a victim of discrimination "a few months" after his termination when he "literally could come up with nothing" that he considered a satisfactory reason for his termination. JA738-39 (Tr. Vol. IV, 56:18-57:1). And he only raised allegations of discrimination after hiring his *second* lawyer to attempt to negotiate a severance agreement. JA742 (Tr. Vol. IV, 60:11-21).

Duvall's binding admission that he did not believe that Novant Health, through Cureton, discriminated against him is fatal to his claim. *Lightner v. City of Wilmington*, 545 F.3d 260, 264 (4th Cir. 2008). When a plaintiff admits that his employer's decision maker did not discriminate against him or act with discriminatory animus, he

31

cannot prove that the adverse employment action was the result of intentional discrimination. *Danial v. Morgan State Univ.*, 426 F. Supp. 3d 135, 147 (D. Md. 2019); *Quintero v. Publix Super Markets, Inc.*, 2006 WL 8431655, at *15 (N.D. Ga. Jan. 18, 2006). *Accord Balderson*, 62 F.4th at 165. On this basis alone, the district court's judgment should be overturned.

Even setting aside his admissions, Duvall did not present "substantial evidence" sufficient for a jury to find intentional discrimination. The only evidence offered by Duvall in support of his intentional discrimination claim was: (1) inaccurate testimony about Novant Health's D&I plan, together with an unsubstantiated allegation that the plan caused his termination; (2) inadmissible and irrelevant testimony about an alleged "pattern" of terminations of white male executives at Novant Health; and (3) subjective, post-termination speculation that discrimination was the only explanation for his termination. As a matter of law, this evidence is insufficient to support a finding that Novant Health intentionally discriminated against Duvall based on his race or sex.

32

### A. Novant Health's D&I plan does not support a finding that Cureton's termination decision constituted intentional discrimination.

Duvall's principal theory of discrimination, which he developed after he left Novant Health, is that Cureton unlawfully terminated his employment because Novant Health's D&I plan encouraged and incentivized Cureton to do so. JA119 (Tr. Vol. I, 54:4-7), JA122 (Tr. Vol. I, 57:8-13). This argument mischaracterizes the D&I plan and seeks to weave from whole cloth a connection between that plan and Cureton's termination decision. The district court erred by concluding summarily that the D&I plan supported the jury's discrimination verdict.

It bears repeating here that, as Duvall has conceded, Cureton *alone* decided to terminate Duvall's employment. JA556-57 (Tr. Vol. III, 101:12-102:11), JA841 (Tr. Vol. IV, 159:7-18). Thus, to hold Novant Health liable for that termination decision, Duvall must show that it was Cureton who intentionally discriminated against him. *Bandy*, 59 F.4th at 710.

### 1. Novant Health's D&I plan is not evidence of intentional discrimination.

At its core, Duvall's argument is that the mere existence of Novant Health's D&I plan rendered his termination discriminatory.

33

The district court accepted this argument without significant analysis, addressing Duvall's allegations concerning the plan in only these lines of its 39-page post-trial order:

> [Duvall] was terminated under circumstances from which reasonable jurors could conclude resulted because of his race and gender, namely the "D&I" initiative with an expressed timeline to remake the workforce to reflect the community and "embed" a culture of "D&I" at [Novant Health] between late 2016 and 2019.

JA1277.

Here the district court erred. A D&I plan standing alone does not constitute evidence of intentional discrimination. *See McCormick v. Gasper*, 2022 WL 16586621, at *4-5 (6th Cir. Nov. 1, 2022); *Bernstein v. St. Paul Cos., Inc.*, 134 F. Supp. 2d 730, 739 & n.12 (D. Md. 2001); *Weinerth v. Martinsville City Sch. Bd.*, 2019 WL 2181931, at *8 (W.D. Va. May 20, 2019), *aff'd*, 797 F. App'x 774 (4th Cir. 2020). Indeed, evidence of a diversity plan "is generally relevant as proof of intentional discrimination only if the employer's adverse actions were taken pursuant to the plan." *Bostron v. Apfel*, 104 F. Supp. 2d 548, 555 (D. Md. 2000), *aff'd*, 2 F. App'x 235 (4th Cir. 2001) (internal quotation marks and alterations omitted); *see also McCormick*, 2022 WL 16586621, at *4-5; *Mangold v. PECO Energy*, 2021 WL 6072818, at *13

34

(E.D. Pa. Dec. 23, 2021); *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006); *Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 594 (E.D. Pa. 2020); *Coppinger v. Wal-Mart Stores, Inc.*, 2009 WL 3163211, at *7 (N.D. Fla. Sept. 30, 2009); *Lutes v. Goldin*, 62 F. Supp. 2d 118, 128 (D.D.C. 1999).

The facts of these authorities are instructive. In *McCormick v. Gasper*, for example, the Sixth Circuit held that an employer's aspirational diversity plan was not evidence supporting a finding of intentional discrimination. There, the employer adopted a "strategic plan" in which diversity was the employer's "number one priority." 2022 WL 16586621, at *2. The plan set recruiting targets for women and other minority groups, including a 25% target for minority hiring. *Id.* at *4. Leaders in the organization repeatedly made statements about the company's desire to increase diversity. *Id.*

The court found that the company's commitment to diversity and statements professing that commitment were not evidence of discrimination. *Id.* In the Sixth Circuit's view, even the numerical recruiting targets "merely indicate[d] a desire to increase the diversity of the applicant pool" and did not commit the employer to hire

applicants from a certain demographic. *Id.* Because the plaintiff had not offered evidence showing that the relevant decision maker had to consider the strategic plan when making the adverse employment decision at issue or otherwise establish a causal connection between the plan and the decision, the court held that the plaintiff failed to prove intentional discrimination by pointing to the employer's diversity commitment and targets. *Id.* at *4-5.

Like the employer in *McCormick*, Novant Health adopted a strategic D&I plan to fulfill a number of goals, including the aspirational goal of creating a workforce that better represented the communities that it serves. *See, e.g.*, JA139 (Tr. Vol. I, 74:5-13), JA188 (Tr. Vol. I, 123:7-13), JA1363-64. And like the aspirational statements in *McCormick*, Novant Health's stated goals of better representing its communities and enhancing diversity and inclusion did not compel executives to make employment decisions based on or incorporating diversity-based goals. JA841-42 (Tr. Vol. IV, 159:19-160:5), JA856 (Tr. Vol. IV, 174:9-19), JA251-52 (Tr. Vol. II, 31:25-32:21). Thus, like the aspirational plan in *McCormick*, Novant Health's plan is not, standing

alone, evidence of intentional discrimination.  *See also Weinerth*, 2019 WL 2181931, at *8.

The case for finding discrimination based on Novant Health's D&I plan is, in fact, significantly weaker than *McCormick* because Novant Health did not adopt or implement *any* targets to achieve a diverse workforce during Duvall's employment.  JA151 (Tr. Vol. I, 86:10-12), JA841-42 (Tr. Vol. IV, 159:19-160:5), JA245-47 (Tr. Vol. II, 25:23-27:17).  Although the Council reviewed data in May 2018 illustrating the demographic makeup of its workforce and considered several metrics to achieve its diversity goals, *see supra* at 17-18, it had not adopted any metrics or targets at the time of Duvall's termination several months later.  Thus, any assumption by Duvall—or by the district court—that Duvall was terminated pursuant to some "unseen" or "unknown" diversity target in the D&I plan is especially tenuous and unsustainable.

### 2. Duvall offered no evidence that Novant Health's D&I plan affected Cureton's decision to terminate Duvall's employment.

Unable to prove intentional discrimination based on the existence of Novant Health's D&I plan alone, Duvall attempted to manufacture a connection between Cureton's employment decision and the plan.

First, Duvall pointed to a document summarizing the May 2018 Council meeting, during which the Council reviewed "diversity measurements" of Novant Health's workforce and leadership demographics and discussed whether those demographics (including race/ethnicity and gender) were representative of Novant Health's patients and community. JA1410-14; *see supra* at 17-18. Duvall made much of the fact that, within 60 days of the Council meeting, Cureton terminated his employment and gave his responsibilities to two women (Everett and Jones), ultimately replacing him with a Black woman (Free) ten months later.

Absent some connection to Cureton's employment decision, however, this evidence does not support a finding of intentional discrimination. That Cureton attended a meeting during which diversity data were reviewed and metrics discussed (but not adopted)

does not mean that Cureton terminated Duvall two months later based on that meeting. Such a logical leap is particularly unfounded when the meeting contained no discussion of diversity targets, no goal to increase the representation of any minority group (including Black women), and no goal to reduce the number of white men (or any other group) in the workforce or in leadership. JA1410-14. *See McCormick*, 2022 WL 16586621, at *4-5.

In addition to the May 2018 Council meeting, Duvall pointed to Novant Health's *post-termination* diversity targets in an effort to forge a connection between the D&I plan and his termination. First, Duvall relied on targets proposed by Novant Health consultant Ernst & Young in 2019, the year after his termination. JA1448-50. These consultant-proposed targets are irrelevant because Novant Health never adopted them. JA252-55 (Tr. Vol. II, 32:22-35:6). Novant Health did not even consider them until *after* Duvall's termination. JA254 (Tr. Vol. II, 34:14-24), JA1432.

Second, Duvall pointed to Novant Health's post-termination goal of increasing the representation of the Hispanic/Latino and Asian communities in its workforce as supposed evidence of a connection

between the D&I plan and his termination.  JA1451-53.  These targets were not directed to reducing the number of white males or increasing the representation of Black females in Novant Health's workforce (the basis for Duvall's discrimination claims); thus, they, too, are irrelevant. JA1451-53, JA257-58 (Tr. Vol. II, 37:6-38:8).  Even if they were relevant, Novant Health did not adopt them until after Duvall's termination.  JA257 (Tr. Vol. II, 37:6-19).  Accordingly, the targets offer no support for the jury's intentional discrimination finding.

Even if Duvall could point to relevant diversity-based targets in place at the time of his termination, those targets would be insufficient to prove intentional discrimination absent some connection to Duvall's termination.  *See McCormick*, 2022 WL 16586621, at *4.  In *Mangold v. PECO Energy*, for example, the employer set a goal to increase diversity in its workforce by 7% in five years.  2021 WL 6072818, at *3-4 (E.D. Pa. 2021).  The court found that this plan—including its numerical goal to increase diversity—was not evidence of intentional discrimination because the plaintiff failed to show a causal connection between the diversity policy and the adverse employment action taken against him. *Id.* at *15.  The same reasoning applies with greater force to Novant

40

Health's D&I plan, which had no diversity or demographic targets whatsoever.

In addition to making unfounded assertions that his termination was connected to diversity-based goals, Duvall mischaracterized the evidence to suggest that Cureton had a financial incentive to fire him and replace him with a Black woman. As explained above, however, the only compensation incentive related to Novant Health's D&I program was a *system-wide* inclusion goal based on team member engagement, a goal measured by Novant Health employees' answers to a single survey question about inclusion. *See supra* at 15-16. Cureton's termination of Duvall would not have affected Novant Health's attainment of that goal or any financial bonus for Cureton related to such attainment. The evidence indisputably shows that there was no financial incentive for Cureton to attempt to alter the demographics of his team in any way. JA841-42 (Tr. Vol. IV, 159:19-160:5), JA856 (Tr. Vol. IV, 174:9-19), JA251-52 (Tr. Vol. II, 31:25-32:21).

Even if a diversity-based bonus had existed at the time of Duvall's termination, it could not, standing alone, support a finding of intentional discrimination. Bonuses tied to the *general* support of

41

diversity initiatives are not independently sufficient evidence of intentional, *particularized* discrimination.  In *Bernstein v. St. Paul Cos.*, for example, the employer had a diversity policy and goal of "building a more diverse group of people and some tolerance and understanding of diversity."  134 F. Supp. 2d 730, 736 (D. Md. 2001).  Managers received bonuses based in part on "their success in supporting diversity by creating and promoting a respectful environment."  *Id.*  The policy did not include quotas or numerical goals for hiring or promoting minority employees.  *Id.*  There was no evidence that the employer pressured managers to hire diverse candidates.  *Id.*  And the manager who carried out the adverse employment action did not receive a financial incentive "affected by her decision to hire . . . minorities."  *Id.*  On these facts, the district court concluded that the diversity plan and its bonus component did not prove intentional discrimination.  *Id.*.  As in *Bernstein*, Novant Health's D&I plan does not prove intentional discrimination against Duvall.

Like the plan in *Bernstein*, Novant Health's D&I plan did not set quotas for hiring Black or female candidates (or reducing the number of white male employees).  JA246-47 (Tr. Vol. II, 26:25-27:17), JA251-52

(Tr. Vol. II, 31:25-32:21), JA257-58 (Tr. Vol. II, 37:15-38:8), JA841-42 (Tr. Vol. IV, 159:19-160:5), JA856 (Trial Tr. Vol. IV, 174:9-19). Cureton was not pressured to apply diversity metrics to his employment decisions. *See* JA246-47 (Tr. Vol. II, 26:25-27:17). Instead, Novant Health, like the employer in *Bernstein*, focused on creating an environment of inclusion. JA188 (Tr. Vol. I, 123:7-10). The only incentive compensation connected to the D&I plan at the time of Duvall's termination was directed to increasing team member engagement, not to increasing diversity or achieving demographic changes in Novant Health's workforce or leadership. JA259-61 (Tr. Vol. II, 39:24-41:13). Thus, like the decision maker in *Bernstein*, Cureton had no economic incentive to terminate Duvall's employment.

Finally, Duvall's post-termination characterization of Novant Health's D&I plan as a scheme to replace white male executives with Black female executives is at odds with his praise of the D&I plan throughout his employment. Duvall, a member of the Council, knew about the D&I plan during his employment and believed at all times that it was "properly done." JA623 (Tr. Vol. III, 168:4-7), JA766 (Tr. Vol. IV, 84:16-21). Before his termination, he never complained that

43

the plan discriminated against white men or raised reservations about the plan with respect to discrimination. JA235 (Tr. Vol. II, 15:7-22), JA844 (Tr. Vol. IV, 162:8-12). His post-termination denunciation of the plan, made in support of this litigation, rings hollow.

Moreover, Cureton confirmed that he did not fire Duvall because of Novant Health's D&I plan. JA841-42 (Tr. Vol. IV, 159:19-160:11). Likewise, he confirmed that he had no incentive under the plan to terminate Duvall's employment. JA842 (Tr. Vol. IV, 160:2-5). Duvall offered no evidence to rebut this testimony. Stripping away Duvall's characterizations and unfounded supposition, the evidence shows only that, at the time Cureton fired Duvall, Novant Health's commitment to diversity was forceful but aspirational—unrooted in any quantifiable metrics or targets that favored the demographic alteration of the company's workforce and unmoored to Cureton's termination decision. Because Duvall did not show any connection between the D&I plan and his termination, the district court erred by entering judgment on the jury's verdict.

**B.** **No admissible evidence reveals a "pattern" of discrimination against white men that supports a finding of intentional discrimination against Duvall.**

The district court also erred to the extent that it concluded that the jury reasonably could have based its discrimination verdict on "statistical evidence showing the demographic effects of" the D&I plan. JA1277. As explained below, the evidence does not support a finding of intentional discrimination based on an alleged "pattern" of terminations or reduction in the number of white male executives at Novant Health.

**1.** **The jury was not allowed to rely on evidence of terminations of employees who did not report to Cureton.**

Though Duvall attempted to testify at trial about numerous former Novant Health employees who did not report to Cureton and whom Cureton did not terminate, *see, e.g.*, JA653-54 (Tr. Vol. III, 198:21-199:5), the district court stood by its earlier rulings and instructed the jury not to consider such evidence, JA61, JA17, JA106 (Tr. Vol. I, 41:3-8), JA705 (Tr. Vol. IV, 23:7-12). This Court cannot consider such inadmissible evidence in assessing whether sufficient evidence supports the jury's verdict. *See Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000).

45

> **2.     The evidence that Duvall offered concerning Cureton's alleged terminations of other white male executives does not support a finding of intentional discrimination.**

Duvall also offered testimony at trial about five male executives who did report to Cureton and who, Duvall alleged, were terminated in close proximity to his own firing.  Duvall's theory was that his termination was part of a larger pattern of discriminatory efforts to reduce the number of white men in leadership and replace them with Black women.  JA805 (Tr. Vol. IV, 123:11-23).

While evidence about an employer's treatment of other employees or groups of employees may be evidence of discrimination, it does not support a finding of intentional discrimination when, as in this case, it has little or no probative value.  *See Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994).  Here, the former employees about whom Duvall testified were so differently situated from Duvall that evidence about them is not probative and cannot support an inference of discrimination against Duvall or white male executives more broadly.  The five employees were:

- A white male who reported to Cureton and **decided mutually with Cureton that it was best for him to**

> **transition out** of his employment with Novant Health;

- A white male who reported to Cureton and whose employment Cureton chose to terminate, but **who was replaced by another white male**;

- A white male who reported to Cureton but **whose role was eliminated (and not filled)** as part of an organizational restructuring;

- A white male who reported to Cureton and **who was not terminated**, but transitioned to an executive position with Novant Health's medical group; and

- **A Black male** who reported to Cureton and whose employment Cureton terminated.

JA849-53 (Tr. Vol. IV, 167:14-171:6). *See also* JA402-05 (Tr. Vol. II, 182:3-185:13).

Not one of these employees supports Duvall's theory that his termination was part of a larger discriminatory plan to eliminate white male executives and replace them with Black women to improve Novant Health's diversity metrics. Thus, the facts surrounding their terminations are not probative of whether Duvall's termination constituted intentional discrimination on the basis of race or sex.

Because, as explained above, no admissible or probative evidence supported Duvall's theory of a "pattern" of terminations of white men—let alone the "substantial evidence" required to deny Novant Health's

47

Rule 50(b) motion—the district court's conclusion that "the demographic effects of" the D&I plan could sustain the jury's intentional discrimination verdict is erroneous.

### C.   Duvall's subjective belief that his termination was based on his race or sex is not sufficient to support a finding of intentional discrimination.

Aside from his mischaracterization of Novant Health's D&I plan and improper "pattern" evidence, the only evidence Duvall presented in support of his discrimination claim was his own post-termination speculation that he must have been fired because of his race or sex. This supposition, too, is insufficient to support the jury's intentional discrimination verdict.

Well-established law in this circuit holds that a plaintiff's speculation about the reasons for his termination is not sufficient to support a jury verdict in his favor. *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 248 (4th Cir. 2020); *Bennett v. CSX Transp., Inc.*, 552 F. App'x 222, 228-29 (4th Cir. 2014); *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 182 (4th Cir. 1998). In ruling on a Rule 50(b) motion, "it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely

48

upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982). Only a "probability" and "not a mere 'possibility'" of discrimination is sufficient to allow the jury to consider the case. *Id.*

Here, Duvall's speculation that his termination must have been based on his race or sex is not sufficient to support the jury's intentional discrimination verdict. There is no evidence—from Cureton's testimony or from the documents reflecting Novant Health's D&I plan—to suggest that Duvall's termination had *anything* to do with the plan, with Duvall's race or sex, or with a broader scheme to replace white male executives with Black female executives. "Only sheer speculation on the jury's part could [have] allow[ed] it to come to such a conclusion." *Bennett*, 552 F. App'x at 229. Because the evidence "certainly does not point to the probability" that Duvall's termination was the result of intentional discrimination, *id.*, the district court erred in failing to grant Novant Health's Rule 50(b) motions for judgment as a matter of law.

\*     \*     \*

Title VII does not require the decision to terminate an individual's employment to be right, wise, or fair. It requires only that the decision

49

not be the result of intentional discrimination. Where, as here, there is

no evidence, direct or circumstantial, that would allow a factfinder to

conclude that a protected characteristic played any role in the

employer's termination decision, judgment must be entered in the

employer's favor. *See, e.g.*, *Balderson*, 62 F.4th at 164-65.

## II. The district court erred by concluding that Duvall mitigated his damages and by awarding him back pay and front pay.

### A. A plaintiff in a Title VII case must mitigate his damages to be eligible for a back pay or front pay award.

Title VII allows a successful plaintiff in an employment

discrimination action to recover back pay and front pay in amounts to

be determined by the court. 42 U.S.C. § 2000e-5(g). That remedy,

however, is subject to the plaintiff's duty to mitigate his damages. *See*

*id.* (noting that a back pay award must be reduced by "interim earnings

or amounts earnable with reasonable diligence"); *Gries v. Zimmer, Inc.*,

795 F. Supp. 1379, 1384 (W.D.N.C. 1992) ("Failure to mitigate damages

by refusing a substantially equivalent job forecloses any front pay

award."); *see also Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763,

771 (7th Cir. 2006) (explaining that "familiar common law duty of

mitigating damages" is imposed on a plaintiff seeking a front pay award).

As this Court has explained, "[i]n the case of a Title VII claimant who has been unlawfully discharged, the duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985), *citing Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982). "Thus," the *Brady* Court explained, "a Title VII plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where he was not actively seeking employment." *Id.*

As *Brady* makes clear, the "reasonable diligence" that the duty to mitigate demands from a Title VII plaintiff requires him "actively" to look for work. *Id.* Thus in *EEOC v. Service News Co.*, this Court disallowed a district court's award of back pay for the first five months after the plaintiff's termination, finding that the plaintiff had not submitted any job applications during that period and had only perused the want ads. 898 F.2d 958, 963-64 (4th Cir. 1990). "Looking through

51

want ads for an unskilled position, without more," this Court observed, "is insufficient to show mitigation, and the back pay award should accordingly be reduced." *Id.* at 963.

Likewise, in *Szedlock v. Tenet*, the district court explained that the "diligence [required of a Title VII plaintiff] implies persistence and industriousness." 139 F. Supp. 2d 725, 734 (E.D. Va. 2001), *aff'd*, 61 F. App'x 88 (4th Cir. 2003). The *Szedlock* Court found that the plaintiff in that case had failed to meet that standard, noting that "plaintiff has made at best only modest or intermittently persistent efforts to seek employment." *Id.* In particular, the efforts that the *Szedlock* Court found wanting included plaintiff's "[applying] for only ten positions, [placing] her resume in a nationwide human resources database, and [searching] vacancy announcements periodically." *Id.* Such efforts, the *Szedlock* Court concluded, "do not reflect reasonable diligence and therefore suggest that plaintiff has not sustained her duty to mitigate damages." *Id.*

**B.    Duvall failed to meet the standards of diligence and industriousness required of a Title VII plaintiff, and he is, therefore, barred from recovering back pay or front pay.**

Here, Duvall failed to satisfy the standards of "reasonable diligence," persistence, and industriousness that the courts of this circuit have imposed on a Title VII plaintiff who seeks back pay and front pay.  As Duvall himself conceded, he did not take the initiative to apply for *any* jobs since he left Novant Health.  JA1936, JA1976-77 (Pl. Dep. Tr. 215:3-5, 252:1-253:2).  "[A]t [his] level," Duvall testified, "[i]t's typically not done."  JA1976 (Pl. Dep. Tr. 252:9-20).  Instead, Duvall said, he waited for recruiters to reach out to him.  JA1976 (Pl. Dep. Tr. 252:9-25).  Duvall did not even take the initiative to approach his LinkedIn contacts; rather, he merely "responded to people who . . . reached out to [him]."  JA1902-03 (Pl. Dep. Tr. 158:22-159:3).

Even when recruiters approached Duvall with lucrative job opportunities, he was diffident and dismissive.  He rejected a position at Minnesota Fairview because a friend told him "it was potentially a very kind of difficult situation," JA777-78 (Tr. Vol. IV, 95:7-96:1), rejected an opportunity at Michigan because he had decided not to consider positions that paid less than $300,000 in base salary, JA778-80 (Tr. Vol. IV, 96:6-

53

98:7), and rejected the chance to make in the "low 400 thousands" (his base pay at Novant Health) in Miami because of Southern Florida's cost of living and its large Spanish-speaking population, JA780 (Tr. Vol. IV, 98:8-25). The law does not permit a Title VII plaintiff to be so choosy, however. "After a period of unemployment," one court in this circuit has explained, "[a] [p]laintiff [is] required to lower her sights and seek the best job available." *Lampley v. Big Discount Food Store, Inc.*, 687 F. Supp. 211, 216 (M.D.N.C. 1988). *See also Ellis v. Ringgold Sch. Dist.*, 832 F.2d 27, 30 (3d Cir. 1987) ("The duty of mitigation may require that a plaintiff accept a lower paying position if one equivalent to that from which [he] was barred is unavailable.").

After a year of being approached by recruiters, Duvall finally accepted a job at HFHS in Detroit in June 2019 that offered him substantially more than he had made at Novant Health. JA1679-81. When he was fired from that position seven months later, after receiving a generous severance package, Duvall resumed his lax habits and casual approach to finding new work. Rather than initiate any

employment searches himself, Duvall once again relied on recruiters to
reach out to him.  JA1976 (Pl. Dep. Tr. 252:9-25).[4]

This time, Duvall was presented with four job opportunities:  at
Cape Fear Medical Center in Fayetteville, North Carolina; Brigham
and Women's/Massachusetts General in Boston; Westchester Medical
Center in New York; and Ohio State University.  JA665-66 (Tr. Vol. III,
210:12-211:14), JA1972-73 (Pl. Dep. Tr. 248:22-249:9).  Duvall
dismissed the Cape Fear job out of hand, never even deigning to ask
what it paid, because Cape Fear was only a "billion dollar system with a
team of ten people and two reports."  JA1973 (Pl. Dep. Tr. 249:12-25).
Duvall engaged in "pleasantries" and introductory calls with recruiters
concerning the other positions, but he did not otherwise pursue them.
JA1974 (Pl. Dep. Tr. 250:6-23), JA666-67 (Tr. Vol. III, 211:6-212:2).
Without any evidence to support his conjecture, Duvall assumed that he
was not receiving additional phone calls from recruiters because of the

_____

[4]     The district court reasoned that Duvall mitigated his
damages immediately following his termination because, within 60 days
of leaving Novant Health, he engaged in the discussions that led to
successful employment at HFHS.  JA1293.  Even if landing employment
at HFHS were sufficient evidence of mitigation, however, no such
evidence exists for the period following Duvall's termination by HFHS.

lawsuit that he had filed against Novant Health and his ensuing discharge from HFHS. JA666-67 (Tr. Vol. III, 211:8-212:2). Apparently, it did not occur to him that the lack of additional job opportunities was due to his own refusal to search for them.

Duvall's cavalier attitude toward his responsibility to find work disqualifies him from a back pay and front pay award. Duvall did not even exhibit the energy of the plaintiff in *Szedlock*, *supra*, who actively applied for ten positions over an eighteen-month period. Instead, he relied entirely on a strategy of waiting for job opportunities to come to him. And even when such opportunities did arrive, Duvall rejected a number of them out of hand and failed to follow up on the others. Just as the plaintiffs in *Service News* and *Szedlock* were deemed ineligible for back pay due to a lack of diligence, persistence, and industriousness, so must the even less diligent Duvall.[5]

---

[5] Because Plaintiff did not exercise any reasonable efforts to find work himself, but instead relied entirely on others to bring work to him, Novant Health is relieved of any obligation to show that comparable work existed. *Wagner v. Dillard Dept. Stores, Inc.*, 17 F. App'x 141, 153-54 (4th Cir. 2001).

**C.   The district court erred by concluding that Duvall satisfied his obligation to mitigate damages.**

The district court minimized the substantial, undisputed evidence of Duvall's lax efforts to find work.  JA1293-95.  Dismissing this evidence in six paragraphs, the court concluded that "[e]vidence at trial supports a finding that Plaintiff made reasonable efforts to mitigate his damages." JA1293.  This conclusion was erroneous, for a number of reasons.

First, the district court mischaracterized the evidence at trial, remarking that Duvall "sought and accepted a better paying job at Henry Ford Health System" and "network[ed] for any connections . . . with some five hundred people on LinkedIn who have ties to health care marketing." JA1293-94.  These observations suggest that Duvall actively sought employment, as required by *Brady*, *supra*, and other governing authorities.  But as explained above, Duvall's conduct with respect to job opportunities was entirely passive.  Rather than initiate a search or apply for any jobs himself, Duvall waited at home for corporate recruiters and his LinkedIn contacts to bring him opportunities.

This distinction between an *active* effort to find work and a *passive* openness to receive work is critical.  If the rule of law urged by Duvall and accepted by the district court is adopted in this circuit, then a

57

plaintiff's duty to mitigate damages in a Title VII case will depend on his luck rather than on his diligence and persistence. Plaintiffs fortunate enough to work at a level or in an industry where the use of corporate recruiters is common, for example, can wait for emails at home rather than send emails out themselves, all the while invoking Duvall's excuse that applying for jobs is "typically not done" at their "level." Other plaintiffs, however, perhaps those who work in low-level retail or service jobs where corporate recruiting practices are foreign, will remain subject to the strictures of *Brady* and *Szedlock*—strictures that demand that a plaintiff actually look for work to be eligible for a back pay or front pay award. Neither Duvall nor the district court cited any authority that would allow for such a "two-tier" test for mitigation of damages.

The district court also erred by accepting at face value Duvall's claim that he "lost viability as a candidate for comparable employment due to asserting his rights against [Novant Health] under Title VII and state law." JA1295. No corporate recruiter ever told Duvall that he "lost viability" as a candidate; to the contrary, the fact that recruiters reached out to him with four different job opportunities following his discharge from HFHS suggests the opposite conclusion. And the CEO of HFHS told

58

Duvall directly that "I don't care about the lawsuit." JA1952-53 (Pl. Dep. Tr. 230:23-231:10). In the face of this evidence, the district court's conclusion that Duvall's lawsuit against Novant Health had a chilling effect on his employment prospects is purely speculative. Even if such an effect had arisen, however, the well-established law of this circuit required Duvall to exercise diligence and persistence to convince potential employers that he was, in fact, a "viable" job candidate.

Finally, the district court erred by concluding that the COVID-19 pandemic "affected Plaintiff's ability to seek comparable employment." JA1295. Duvall presented no evidence at trial to indicate that the pandemic materially hindered his ability to find a new job. To the contrary, evidence that Duvall's communications about job opportunities were conducted by phone calls with recruiters belies any suggestion that the "lock-downs and travel limits" associated with COVID prevented Duvall from searching for a job. *See, e.g.*, JA1973 (Pl. Dep. Tr. 249:1-25), JA666-67 (Tr. Vol. III, 211:6-212:2). Even if COVID had temporarily disrupted Duvall's job search, the district court did not explain how or why such a disruption persisted through the October 2021 jury trial (which was held in person).

59

In sum, the district court's conclusion that Duvall exercised reasonable diligence and mitigated his damages was based on a mischaracterization of evidence admitted at trial and on speculation not tethered to any evidence at all. The district court's reasoning, if accepted, would give rise to an unworkable mitigation standard that would excuse large classes of professional, white-collar employees from any obligation to apply for jobs—an obligation that has long been the rule in this circuit. For at least these reasons, the district court's conclusion that Duvall mitigated his damages should be set aside.

## III. The district court erred by concluding that Duvall presented evidence sufficient to support a punitive damages award.

Punitive damages are "an extraordinary remedy" properly awarded in Title VII cases only under "limited circumstances." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 150-52 (4th Cir. 2017); *Stephens v. S. Atl. Canners, Inc. (Coca Cola Co.)*, 848 F.2d 484, 488 (4th Cir. 1988). Both "the text and background of the Civil Rights Act of 1991, which authorizes punitive damages, emphasize that this extraordinary remedy is not to be awarded automatically in every successful Title VII suit." *Harris v. L&L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997). To

obtain punitive damages, a plaintiff must prove that his employer engaged in unlawful, intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Ward v. AutoZoners, LLC*, 958 F.3d 254, 268 (4th Cir. 2020). An employer acts with malice and reckless indifference when it is "motivated by evil motive or intent," or engages in "reckless or callous indifference to the [plaintiff's] federally protected rights." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).

To recover punitive damages from an employer based on the acts of a managerial employee, the plaintiff must show that the employee was acting within the scope of his employment and that "the evidence [is] sufficient for a reasonable jury to find that the 'employer's decision maker'—that is, the managerial employee—'discriminated in the face of a perceived risk that the [adverse employment] decision would violate federal law.'" *Ward*, 958 F.3d at 268 (quoting *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 372 (4th Cir. 2008)). In other words, the plaintiff must show that the decision maker knew or "subjectively appreciated" that he was violating federal law by carrying out the adverse employment action. *Consol Energy*, 860 F.3d at 151.

The Fourth Circuit has held that, "for a punitive damages award to be justified on the basis of reckless indifference, the evidence must be sufficient for a reasonable jury to make four findings:  (1) That the employer's decision maker discriminated in the face of a perceived risk that the decision would violate federal law; (2) That the decision maker was a principal or served the employer in a managerial capacity; (3) That the decision maker acted within the scope of his employment in making the challenged decision; and (4) That the employer failed to engage in good-faith efforts to comply with the law." *Federal Express*, 513 F.3d at 372.  At a minimum, Duvall failed to offer evidence to support the first and fourth of these findings.  Thus, the district court erred by failing to set aside his punitive damages award.

### A.    Duvall did not prove that Cureton discriminated in the face of a perceived risk that his decision would violate Title VII.

There is no evidence in the record that Cureton—the sole decision maker—knew about Title VII, much less that, by terminating Duvall, he was acting in the face of a perceived risk that his actions would violate Title VII.  Duvall never asked Cureton at trial whether he knew about Title VII or any similar anti-discrimination law.

62

Notwithstanding this gap in the evidence, the district court concluded that "[a] reasonable juror could infer that Cureton, as a high-level executive at a large corporation, had knowledge of federal anti-discrimination laws, understood the goals of the D&I Program, and was willing to terminate a white male in order to advance diverse candidates and promote Defendant's clearly stated goal to promote diversity and inclusion." JA1280. Based on these conclusions, the court upheld the jury's punitive damages award, remitting it only to the statutory maximum of $300,000.

No evidence supports the district court's inference that Cureton knew about "federal anti-discrimination laws," or that he was "willing to terminate a white male in order to advance diverse candidates." JA1280. Notably, the district court did not cite any such evidence in its ruling. Even if there were evidence that Cureton knew *generally* about Title VII, basic or rudimentary knowledge about a federal anti-discrimination law is not sufficient to support a punitive damages award. *EEOC v. Loflin Fabrication, LLC*, 462 F. Supp. 3d 586, 602 (M.D.N.C. 2020). Rather, the decision maker's "basic knowledge of Title VII's requirements" must be accompanied by evidence supporting an

63

inference that the decision maker "subjectively appreciated a risk that [his decision] failed to meet" Title VII's requirements. *Consol Energy*, 860 F.3d at 151.

Duvall cannot make that showing here, because there is no evidence to support a finding that Cureton intentionally discriminated against Duvall by terminating him based on his race or sex. *See supra* at 30-50. As explained, *see supra* at 34-47, no evidence ties the D&I plan to Cureton's employment decision or supports the notion that Cureton or Novant Health had a broader agenda to replace white male executives with Black female executives. By extension, there is no evidence that Cureton acted in the face of a "perceived risk" that his decision to terminate Duvall would violate Title VII. *See, e.g.*, *Christensen v. Equitable Life Assur. Soc'y of the United States*, 767 F.2d 340, 342-44 (7th Cir. 1985) (concluding that employer's diversity plan was not evidence of intentional discrimination and reversing award of compensatory and punitive damages). Where, as here, there is no evidence that the decision maker engaged in intentional discrimination, punitive damages are not appropriate. *Ward*, 958 F.3d at 267, 269.

There is also no evidence of "egregious" conduct suggesting reckless indifference to Duvall's rights under Title VII. To the contrary, Cureton testified that he did not terminate Duvall's employment for any discriminatory reason, and Duvall admitted that he did not believe Cureton ever discriminated against him or acted with personal animus toward him. JA841-42 (Tr. Vol. IV, 159:19-160:11), JA653 (Tr. Vol. III, 198:10-15), JA737-38 (Trial Tr. Vol. IV, 55:5-56:3), JA743-45 (Tr. Vol. IV, 61:7-63:13), JA748 (Tr. Vol. IV, 66:18-25), JA755 (Tr. Vol. IV, 73:4-19). In the face of such admissions by Duvall himself, the district court erred by concluding that Cureton acted with the necessary malice or recklessness to support a punitive damages award.

**B.      Novant Health's good-faith efforts to comply with Title VII preclude a punitive damages award.**

Even if Duvall had shown that Cureton terminated him with malice or reckless disregard of his rights under Title VII, he still would not be entitled to receive punitive damages because Novant Health made good-faith efforts to comply with Title VII. "Th[e] good-faith exception rests on the notion that the existence and enforcement of an anti-discrimination policy shows that the employer itself 'never acted in

reckless disregard of federally protected rights.'" *Lowery*, 206 F.3d at 445 (quoting *Kolstad*, 527 U.S. at 544). Evidence showing that the employer extensively implemented an anti-discrimination policy weighs strongly in favor of applying the good-faith exception. *Bryant*, 333 F.3d at 548.

For example, in *Bryant v. Aiken Regional Medical Centers Inc.*, this Court reversed a punitive damages award where the employer had "an extensively implemented organization-wide Equal Employment Opportunity Policy," was committed publicly to non-discrimination, encouraged employees to report discrimination, had a "carefully developed diversity training program," and "voluntarily monitored departmental demographics as part of an ongoing effort to keep the employee base reflective of the pool of potential employees in the area." 333 F.3d at 548-49. The Court concluded that "[t]hese widespread anti-discrimination efforts . . . preclude[d] the award of punitive damages." *Id.* at 549.

The same reasoning applies here. Novant Health is an equal opportunity employer committed publicly to non-discrimination. *See* Novant Health, *Diverse Culture*, Careers

https://careers.novanthealth.org/careers/.[6]  Its D&I plan is reflective of

this commitment and includes efforts to train employees on diversity

and monitor demographics to achieve a workforce reflective of the

patient community.  *See* JA248-50 (Tr. Vol. II, 28:14-17, 29:9-16, 30:3-

18), JA151 (Tr. Vol. I, 86:6-10), JA188 (Tr. Vol. I, 123:7-13).  As in

*Bryant*, Novant Health's good-faith commitment to complying with Title

VII precluded a punitive damages award, and the district court erred by

failing to set aside that award in its entirety.

## CONCLUSION

For the foregoing reasons, Novant Health respectfully requests

that the Court reverse the district court's orders and judgment

(i) denying Novant Health's renewed motion for judgment as a matter of

---

[6]     The Court may take judicial notice of matters of public record, including "factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007). *See also Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 409 n.1 (D. Md. 2022) (taking judicial notice of information on company's public website); *Brown-Thomas v. Hynie*, 367 F. Supp. 3d 452, 457 n.3 (D.S.C. 2019) (taking judicial notice of facts on website under Fed. R. Evid. 201(b), because website was a source "whose accuracy cannot reasonably be questioned").

law, (ii) denying Novant Health's motion to set aside punitive damages, and (iii) granting Duvall's requests for back pay, front pay, and attorney's fees and costs.

## REQUEST FOR ORAL ARGUMENT

Novant Health requests oral argument because oral argument will be helpful to the Court.  This case presents important questions about white-collar employees' obligations to mitigate damages and the intersection of federal anti-discrimination law and private entities' aspirational commitments to diversity and inclusion.

This 6th day of April, 2023.

Respectfully submitted,

/s/ Charles E. Johnson
Charles E. Johnson
cejohnson@robinsonbradshaw.com

Angelique R. Vincent-Hamacher
avincent@robinsonbradshaw.com

Stephen M. Cox
scox@robinsonbradshaw.com

Travis S. Hinman
thinman@robinsonbradshaw.com

ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: 704.377.2536

Benjamin R. Holland
ben.holland@ogletree.com

Margaret Santen
maggie.santen@ogletree.com

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
201 South College Street
Charlotte, North Carolina 28244
Telephone: 704.342.2588

*Counsel for Defendant-Appellant*
*Novant Health, Inc.*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App.
    P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 12,478
    words, excluding the parts of the brief exempted by Fed. R. App.
    P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App.
    P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because this brief has been prepared in a proportionally
    spaced typeface, using Microsoft Word 2016, in 14-point Century
    Schoolbook type.

    This 6th day of April, 2023.

    /s/ Charles E. Johnson
    Charles E. Johnson
    *Counsel for Defendant-Appellant*
    *Novant Health, Inc.*